# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ARTHUR A. WIGGINS, III,

       Plaintiff,

v.                                 Case No.  3:19-cv-188-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying his application for a period of disability, disability insurance

benefits ("DIB"), and supplemental security income ("SSI").  Plaintiff filed his

applications for DIB and SSI on January 22, 2015, alleging a disability onset date

of January 22, 2015.[2]  (Tr. 57, 112.)  These claims were denied initially and on

reconsideration.  A hearing was held before the assigned Administrative Law

Judge ("ALJ") on January 18, 2018, at which Plaintiff was represented by

counsel.  (Tr. 4-39.)  The ALJ issued an unfavorable decision on February 6,

_____

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 24.)

[2] Plaintiff had to establish disability on or before March 31, 2020, his date last
insured, in order to be entitled to a period of disability and DIB.  (Tr. 57.)  However, the
undersigned notes that Plaintiff's DLI was also listed as December 31, 2018.  (Tr. 112.)

2018, finding Plaintiff not disabled from January 22, 2015, the alleged disability onset date, through the date of the decision.[3] (Tr. 57-69.)

Plaintiff is appealing the Commissioner's final decision that he was not disabled during the relevant time period. Plaintiff has exhausted his available administrative remedies and the case is properly before the Court. (Tr. 41-48.) The Court has reviewed the record, the briefs, and the applicable law. For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I. Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937

---

[3] Plaintiff filed a second application for DIB and was found disabled with an onset date of February 7, 2018. (Doc. 19 at 3.)

F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal: (1) that the ALJ's medical opinion weight analysis is not supported by the record and (2) that the ALJ's subjective symptom assessment was erroneous.  (Doc. 26 at 14.)  Specifically, Plaintiff argues that the ALJ erred by according little weight to the opinions of Dr. Dale Brown, Plaintiff's treating physician, while giving great weight to the opinions of the State Agency medical consultants, Drs. H. Kushner and Loc Kim Le.  (*Id.* at 14-19.)  Plaintiff also argues that the ALJ erred in evaluating Plaintiff's subjective complaints and that his rationales for dismissing Plaintiff's "testimony and other statements . . . were improper and relied upon mischaracterizations of the medical record in order to discount Plaintiff's subjective complaints."  (*Id.* at 19-24.)  Defendant responds that the ALJ's RFC findings, evaluation of the medical opinion evidence, and assessment of Plaintiff's pain and other symptoms are supported by substantial evidence.  (Doc. 29 at 5-20.)   The Court agrees with Plaintiff on the first issue, therefore, does not address the remaining issues in detail.

## A. Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating

physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

When a claimant seeks to establish disability through his own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id.*

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that his pain is disabling through objective medical evidence from an acceptable medical source that shows a medical impairment that could reasonably be expected to produce the pain or other symptoms, pursuant to 20 C.F.R. §§ 404.1529(a), 416.929(a), "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561. *See also* SSR 16-3p[4] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the

---

[4] SSR 16-3p rescinded and superseded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
> . . .
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[2] The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
> . . .
> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will

---

[2] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her stressors;

- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## B. Relevant Evidence of Record

### 1. Hospitalizations

Plaintiff was hospitalized at Cobb Hospital in Austell, Georgia, from May 29 to June 8, 2016 after presenting to the emergency room complaining of shortness of breath, non-productive cough, and wheezing. (Tr. 1594-1700.) The emergency department notes indicate that:

> This [was] a new problem. The current episode started 24 to 48 hours ago. The problem has been gradually worsening. Associated symptoms include cough and wheezing. . . . He has tried beta-agonist inhalers for the symptoms. The treatment provided mild relief. Associated medical issues include COPD[,] [chronic obstructive pulmonary disease].

(Tr. 1597.) Plaintiff also reported "using [a] home regimen including [S]ymbicort[] and [S]piriva with addition of inhalers without relief." (Tr. 1660.) An emergency department physical exam showed: "[Plaintiff] [was] in respiratory distress. He [had] wheezes in the right upper field, the right lower field, the left upper field,

and the left lower field.  Mod[erate] resp[iratory] distress.  Able to speak in short one[-]word sentences.  Increased work of breathing with tachypnea and subcostal accessory muscle use."  (Tr. 1598.)  His diagnoses at admission were acute exacerbation of COPD and hypoxia.  (Tr. 1494.)  Plaintiff attributed his symptoms to a change in the weather.  (Tr. 1665.)  Plaintiff was treated for acute exacerbation of COPD with intravenous steroids, prednisone, and bronchodilators.  (Tr. 1631.)  Plaintiff was also treated for acute kidney injury, hypertension, hypophosphatemia, dyspnea, and acute bronchitis.  (TR. 1636-44.)  Plaintiff was initially due to be discharged on June 4, 2016, but he "was noted with [shortness of breath] before [his] anticipated discharge" and remained hospitalized until June 8, 2016.  (*See* Tr. 1594-96, 1626, 1631.)  Upon discharge, Plaintiff was prescribed amlodipine (Norvasc), fluctinasone inhaler (Flovent), montelukast (Singulair), and prednisone (Deltasone), and instructed to continue using his albuterol inhaler.  (Tr. 1595-96.)  Plaintiff was also directed to follow up with a pulmonologist at the VA within one week of discharge. (Tr. 1596.)

On September 6, 2016, Plaintiff presented to the emergency department at Baptist Medical Center in Jacksonville, Florida, complaining of worsening shortness of breath over a three-day period.  (Tr. 2183.)  Emergency department admission notes indicate that Plaintiff "tried to use [his] albuterol inhalers at home but did so unsuccessfully," that he used albuterol and Spiriva at home, but was

taken off Symbicort by the VA.  (*Id.*)  Plaintiff was placed on BiPap[5] to assist with

breathing but was able to be weaned and was given Levaquin and Solumedrol.

(*Id.*)  X-rays showed Plaintiff's lungs were hyperinflated and appeared

emphysematous, but no infiltrates were evident.  (Tr. 2185-86.)  A consultation

report by pulmonologist Jennifer Fulton, M.D. provided the following assessment

and plan:

> This is Mr. Arthur Wiggins, who is an unfortunate 62 year-old
> gentleman with history of chronic obstructive pulmonary disease with
> multiple frequent exacerbations, who comes in with a chronic
> obstructive pulmonary disease exacerbation.  We will continue with
> his Symbicort at home.  We will restart Spiriva.  We will add IV
> steroids and doxycycline at this time.  We will continue with deep
> venous thrombosis prophylaxis.  The patient will be admitted to the
> Progressive Unit.  . . .  At this time, [the] patient does not appear to
> need BiPAP, but we will have it available PRN [as needed].  We will
> need to be cautious with oxygen levels in this patient.

(Tr. 2189.)  Plaintiff was diagnosed with COPD exacerbation, history of prostate

cancer, status post radiation, and hypoxic respiratory failure.  (Tr. 2192.)  His

discharge summary noted as follows:

> [Plaintiff] . . . presented to Baptist Medical Center . . . with
> worsening shortness of breath.  He state[d] that he had tried
> nebulizer treatments at home without improvement and therefore
> presented to the hospital.  Chest [X]-ray on admission was negative
> for any infiltrate.  He briefly had to be on BiPAP before being
> weaned off in the emergency room.  He was admitted upstairs to
> the floor, started on IV Solu-Medrol as well as DuoNebs, Spiriva[,]
> and Symbicort was added to his regimen.  Pulmonary Critical Care
> was consulted after patient had worsening shortness of breath and
> hypoxia on the night of the 6th.  Doxycycline was then added to his

---

[5] BiPap is a bilevel positive airway pressure ventilator that helps with breathing.
*See* Johns Hopkins Medicine, *What is BiPap?*, https://www.hopkinsmedicine.org
/health/treatment-tests-and-therapies/bipap (last visited March 4, 2020).

regimen. He did not need to have BiPAP at [that] time. Patient was eventually slowly weaned off [BiPAP] and down to oral steroids, prednisone[,] with good results and he was discharged home without any further complications.

(Tr. 2192-93.) Upon discharge on September 10, 2016, Plaintiff was instructed to continue with his medications and to follow up with his primary care physician, Dr. Brown. (Tr. 2193.)

Plaintiff was again hospitalized at Baptist Memorial Medical Center from from November 3 to November 9, 2016. (Tr. 2144-82.) His discharge diagnoses were acute COPD exacerbation, acute hypercarbic respiratory failure requiring BiPap, and acute troponin elevation, chronic essential hypertension, and prostate cancer. (Tr. 2159.) His discharge summary stated, in part, as follows:

[Plaintiff] was admitted on 11/3 with chief complaint of dyspnea. On admission, he was noted to be in moderate distress. Work-up was notable for an ABG [arterial blood gas] demonstrating a respiratory acidosis (pH 7.29/pCO2 59), clear [chest X-ray], negative flu swab, and normal basic labs. Mr. Wiggins was placed on BiPAP, given IV steroids, duonebs [sic] and Levofloxacin. His respiratory status notably improved and he was subsequently transitioned to NC and eventually to room air, with marked improvement in his noted work of breathing and symptoms. A plan was made for discharge . . . on a prednisone taper (to be completed 11/21) and Levaquin . . . . Pulmonary rehabilitation through the VA was recommended following discharge.

Mr. Wiggins' course was also [complicated by] a single, mild troponin elevation (0.08) and reported chest pain. Cardiology was consulted. His EKG was without noted ischemic changes. An echo[cardiogram] was completed and also noted to be normal. Chest pain was thought to be [secondary] to his noted cough and further evaluation was not deemed necessary.

Also, of note, Mr. Wiggins was found to be hypertensive on arrival . . . . [He] was encouraged to monitor his [blood pressure] at home,

with further medication titration to take place in the outpatient setting if needed.

Prior to discharge, the medication list . . . was reviewed and return precautions were discussed. Home health [physical therapy] services were set up, and Mr. Wiggins was deemed stable for discharge, [with] plans for follow-up with Dr. Dale Brown at the V[A] in 1-2 weeks.

(Tr. 2160.) The emergency department notes also indicate that Plaintiff reported he had "been using his nebulizer treatments continuously over the [previous] 24 hours [that] weekend with marginal improvement," and that the exacerbating factor was exertion. (Tr. 2162-63.)

Plaintiff was again hospitalized at Baptist Medical Center from December 21 to December 24, 2016 due to severe chronic COPD exacerbation. (Tr. 2118-42). Plaintiff complained of being unable to breathe and stated he had been on a course of antibiotics and prednisone the week prior and had improved somewhat, but his symptoms worsened in the preceding days "with increased coughing, wheezing, [and] shortness of breath." (Tr. 2118.) Admission notes indicated that Plaintiff "ha[d] been taking his inhalers without any relief, so he came to the emergency department, where he was placed on BiPAP, but he did not tolerate that[, so [he] was changed to nasal CPAP, which he [tolerated] better. He [was] still having a lot of trouble breathing, however." (*Id.*) Plaintiff's physical examination showed he was "in moderate acute respiratory distress" even with CPAP. (Tr. 2119.) James Fulner, M.D., the admitting physician, assessed that Plaintiff had severe chronic COPD exacerbation, requiring BiPap and nasal

CPAP, and acute hypercarbic respiratory failure requiring admission to the Progressive Care Unit. (Tr. 2120.) Dr. Fulner noted he had spoken "with Dr. Radwan, who [would] assist from a pulmonary standpoint in case he deteriorate[d]," and that they would "use standard COPD antibiotics, nebulizers, and steroids and continue his usual Spiriva." (*Id.*) Dr. Fulner also noted, *inter alia*, that Plaintiff "was critically ill" and "[a]pproximately 40 minutes of critical care time [was] spent at [Plaintiff's] bedside." (*Id.*) Plaintiff's discharge summary indicated, in part, as follows:

> [Plaintiff] [had] significant history of COPD [and] presented with worsening cough and wheezing and shortness of breath despite outpatient steroid course. He was noted to be in respiratory failure with hypercapnia and required BiPAP initially. Pulmonary and Critical Care were consulted, and he was seen in follow[-]up by Pulmonary, and he was placed on IV steroids, nebulizer treatment, and also bronchodilators, and also empiric antibiotics. His chest [X]-ray was clear. . . . [His] respiratory status improved and . . . [had] been [taken] off BiPAP [and] on room air, and he also had walking pulse oximeter. Oxygen saturation did not decrease, so he was followed by Pulmonary yesterday, and steroid was changed to p.o. [oral] prednisone and continuing on bronchodilators and signed off. The patient [was] seen in follow[-]up today. He report[ed] he is doing much better. He has been up to the bathroom, though he has not been up and walking around the hallway. He still has some shortness of breath but no fever or chills. He feels that he wants to go home.

(Tr. 2125-26.) Physical exam revealed bilaterally diminished breath sounds with scattered expiatory rhonchi. (Tr. 2126.) Plaintiff was instructed to monitor his blood pressure at home, follow up with his primary care physician, and continue with his medication, including prednisone and antibiotics. (*Id.*)

Plaintiff was again hospitalized from January 19 to January 24, 2017 at Baptist Medical Center with COPD exacerbation.  (Tr. 2073-2117.)  Plaintiff received critical care and was admitted due to the need for intensive treatment and severity of symptoms.  (Tr. 2075.)  A Critical Care Consultation Report noted:

> According to records review[,] the patient had been struggling all day with breathing and his wife called [emergency medical services].  He tells me that this had been coming on over the last few days.  He tells me he is compliant with his medication[,] but when asked exactly what his regimen is he shrugs his shoulders.  Upon arrival, EMS found him to be in some respiratory distress.  He started immediately receiving breathing treatments and steroids and was subsequently started on BiPap.  The patient states that this feels like his previous COPD exacerbations.  . . . *He is in some moderate respiratory distress making discussion difficult.*

(Tr. 2076 (emphasis added).)  Physical examination showed Plaintiff's lungs were "tight and wheezy with inspiratory and expiratory wheezing on the left, less so on the right.  He [was] using accessory muscles with abdominal respirations."

(Tr. 2077.)  Chest X-rays revealed hyperinflation of the lungs without infiltrate.

(Tr. 2078.)  Dr. Fulton's assessment revealed the following:

> [Plaintiff presents] with past medical history of chronic obstructive pulmonary disease who has had 3 consecutive monthly admissions to our hospital for COPD exacerbations.  Of note, patient has traditionally been getting his care in the VA system but has had frequent recurrent admissions here.  Patient now presents with a recurrent COPD exacerbation without evidence of pneumonia or bronchitis.  [He] has been started on albuterol nebulizers.  He has been restarted on his Symbicort and will restart his Spiriva.  He has been given Solu-Medrol 80 mg IV every 6 hours which we will change to every 8 [hours].  He has also been restarted on Levaquin for atypical infections.  Patient is on IV fluids.  We will titrate the BiPap as able.  *The patient has had a history of slow recovery from*

> *his COPD exacerbations. We will monitor him carefully. I am*
> *concerned that this patient is not maintaining his medication regimen*
> *at home <u>or</u> there is a secondary process in play here as he has had*
> *such frequent admissions in the last few months.* Also of note,
> patient has a mild troponin leak and he was started on a heparin drip
> in the ER due to concerns of acute coronary syndrome. We will
> avoid beta blockers in the setting of acute bronchospasm. . . .

(*Id.* (emphasis added).) A consultation report by cardiologist Marcus Cox, M.D.

noted that Plaintiff was "admitted for worsening shortness of breath but also

note[d] worsening shortness of breath and chest tightness with exertion relieved

with rest. ECG show[ed] sinus rhythm and serial troponins [had] risen from 0.05

to 0.82 to 0.76." (Tr. 2083.) Dr. Cox recommended "heart catherization with

possible intervention, stenting or angioplasty." (*Id.*)

Plaintiff's discharge summary stated as follows:

> [Plaintiff has] a history of [COPD] and also multiple frequent
> admissions. He presented with increased shortness of breath over a
> few days. He was struggling to breathe but no fever. He had some
> cough but nonproductive. He initially required BiPAP placed in ER
> and he was placed on IV steroids, antibiotics, bronchodilators and
> [was] admitted. He was also found to have elevated troponin.
> Cardiology was also consulted. Patient's symptoms responded to
> treatment and he underwent cardiac catheterization. Per
> Cardiology, he had normal coronary arteries with normal LVEF so
> most likely stress-induced increased cardiac enzymes. . . . [He
> was] evaluated by Pulmonary and changed the IV steroids to PO
> prednisone and continued him on bronchodilators. . . . [He] has been
> improving and today he reported he is doing better. He has been up
> and about, going to the bathroom, though he still has some
> shortness of breath going to the bathroom. He is still wearing the
> low oxygen so we will have the walking pulse oximetry before
> discharge.

(Tr. 2085-86.)   Plaintiff was instructed to continue with medications, to follow up with the Pulmonary Department on an outpatient basis and with his primary care physician, and recommended a Pulmonary Function Test ("PFT").  (Tr. 2086.)

Plaintiff was also hospitalized at Baptist Medical Center from September 1 to September 7, 2017.  (Tr. 2237-69.)  Emergency department notes indicate that Plaintiff presented "with a chief complaint of difficulty breathing, wheezing and non-productive cough for 2-3 days that worsened while driving back from Atlanta, just prior to arrival in [emergency department]."  (Tr. 2237.)  Plaintiff also reported "chest tightness and chest discomfort with breathing and coughing," which were "[e]xacerbated by people smoking at the football game [the night before] and the heat."  (*Id.*)  Plaintiff "was noted to be dyspneic with inability to speak in sentences, wheezing, diaphoresis with increased work of breathing.  He was placed on [BiPap] and given Solumedrol, magnesium and [nebulizers]."  (*Id.*)  His symptoms were reportedly somewhat alleviated by nebulizers and oxygen in the emergency department and were noted to be similar to prior COPD exacerbations.  (*Id.*)  Plaintiff received critical care and his acute exacerbation of COPD was considered an emergency condition due to the acute onset of symptoms and a threat to life or limb.  (Tr. 2253.)  X-rays showed that the lungs were clear and there was no evidence of an acute cardiopulmonary abnormality, but Plaintiff was admitted "[d]ue to ongoing medical conditions outlined above, need for intensive services in the hospital, inpatient setting for close monitoring and adverse outcomes if not monitored."  (Tr. 2240-41.)  The Pulmonary

Diseases Consultation Report noted Plaintiff had a history of COPD and asthma with acute exacerbation due to irritants.  (Tr. 2243-44.)   Plaintiff was continued on antibiotics, started on prednisone therapy, and was instructed to follow up with his VA pulmonologist within one week of discharge.  (Tr. 2244.)   Plaintiff was discharged on September 7, 2017, after his condition improved with supportive care, although he still reported presyncope/dizziness and weakness with standing.  (Tr. 2245-46.)  Plaintiff reported his dizziness symptoms began when he stared Flomax and was instructed to speak with his urologist about alternative treatment options.  (Tr. 2246.)

### 2.  Dr. Brown

On March 3, 2016, Dr. Brown completed a Physical Medical Source Statement ("MSS").  (Tr. 1121-27.)  Dr. Brown opined that Plaintiff could occasionally lift and carry up to ten pounds, but never more than ten pounds. (Tr. 1121.)  Dr. Brown attributed his findings to Plaintiff's ongoing pain status post hernia repair performed in June and October 2015.  (*Id.*)  Dr. Brown also opined that Plaintiff could sit, stand, and walk for 30 minutes at a time without interruption, and could only sit, stand, and walk for a total of one hour each in an eight-hour work day.  (Tr. 1122.)  Dr. Brown based his opinion on Plaintiff's hernia pain as well as left knee arthritis pain.  (*Id.*)  Dr. Brown also opined that Plaintiff could never perform postural activities (climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl).  (Tr. 1124.)  With respect to environmental limitations, Dr. Brown opined that Plaintiff could never tolerate

exposure to unprotected heights, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold or heat; but he could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, and vibrations. (Tr. 1125.)  He opined that Plaintiff could not walk for more than one block at a reasonable pace on rough or uneven surfaces.  (Tr. 1126.)  Dr. Brown attributed these limitations to Plaintiff's hernia-related pain and COPD, finding that the limitations lasted or were expected to last for 12 months or more.  (*Id.*)

On December 29, 2016, Dr. Brown prepared a Pulmonary Medical Source Statement, stating that he had seen Plaintiff approximately four times per year over a three-year period for COPD and identified Plaintiff's symptoms as wheezing, shortness of breath, episodic acute bronchitis, fatigue and coughing. (Tr. 1138.)  Dr. Brown indicated that emotional factors contributed to the severity of Plaintiff's symptoms and his functional limitations.  (*Id.*)  Dr. Brown opined that Plaintiff's prognosis was good, but that his impairments had lasted or were expected to last at least 12 months.  (Tr. 1139.)  Dr. Brown opined that Plaintiff could only walk one to two city blocks without rest or severe pain; could sit for more than two hours at a time; and could stand for 30 minutes at a time.  (*Id.*) He also opined that Plaintiff could stand and walk for less than two hours and sit for about two hours total in an eight-hour workday.  (*Id.*)  He also opined that Plaintiff would need to take four to six unscheduled breaks, lasting 15 to 20 minutes, during the workday during which Plaintiff would have to sit quietly.  (*Id.*) Dr. Brown also opined that Plaintiff could rarely lift and/or carry ten pounds, and

never more than ten pounds; rarely twist and stoop; never crouch/squat, climb ladders or stairs; and that he was to avoid all exposure to environmental hazards. (Tr. 1140.)  Dr. Brown opined that Plaintiff would likely be off-task at least 25% of a typical workday, that he was incapable of even low-stress jobs as stress made his breathing more labored, and that Plaintiff's impairments were likely to produce "good days" and "bad days."  (Tr. 1141.)  Dr. Brown noted that Plaintiff would likely be absent from work more than four days per month as a result of his impairments or treatment.  (*Id.*)  Dr. Brown also listed Plaintiff's other limitations, including adjustment disorder, urinary frequency, chronic pain in groin after hernia surgery, and knee pain.  (*Id.*)

### 3.  State Agency Medical Consultants

On September 15, 2015, Loc Kim Le, M.D., a medical consultant, opined that Plaintiff was not disabled and could perform his past relevant work.  (Tr. 100-11.)  On September 15, 2016, Dr. Kushner, a State agency medical consultant, completed a Physical RFC Assessment, finding, *inter alia*, that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and could stand, walk, and/or sit for a total of about 6 hours in an 8-hour workday.  (Tr. 1128-29.)  Dr. Kushner also found some postural and environmental limitations.  (Tr. 1130-32.)  Dr. Kushner assessed Plaintiff's left knee disfunction and post-operation inguinal neuropathy, and opined that the "[a]lleged restrictive pain ha[d] only historical basis (no clear current anatomic basis) and [claimant] exhibit[ed] few or no pain behaviors."  (Tr. 1136.)  Dr.

Kushner determined that the RFC completed by Dr. Brown in March 2016 was "very, very restrictive," "based on pain only," was not supported by the evidence and gave it no weight.  (*Id.*)  Dr. Kushner also dismissed a February 3, 2016 Worker's Compensation evaluation by Dr. Robert Chapa, opining that Plaintiff could not work due to his hernia repair and related pain, as an issue reserved for the Commissioner.  (*Id.*)

### C. The ALJ's Decision

At step two of the five-step sequential evaluation process,[6] the ALJ found that Plaintiff had the following severe impairments: "[COPD]; asthma; osteoarthritis; status post (s/p) hernia repair; s/p prostate cancer; and history of degenerative joint disease, knees."  (Tr. 59 (internal citation omitted).)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 61.)

The ALJ then found that, through the date of the decision, Plaintiff had the Residual Functional Capacity ("RFC") to perform medium work, as defined pursuant to 20 C.F.R. §§ 404.1567(c), 416.967(c), but with the following limitations:

> The claimant is limited to no more than occasional climbing of ramps, stairs, ropes, ladders or scaffolds; he is limited to no more than frequent stooping and balancing; he is limited to no more than occasional kneeling, crouching or crawling; he must avoid

---

[6] The Commissioner employs a five-step process in determining disability.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

concentrated exposure to extreme temperatures and work hazards such as unprotected heights and dangerous machinery; and the claimant must avoid even moderate exposure to respiratory irritants including fumes, dust, gases, odors and poor ventilation.

(Tr. 61.)  In making this RFC determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of th[e] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 62.)

In making these findings, the ALJ considered Plaintiff's statements and testimony, the objective medical evidence, as well as the opinions of treating, examining, and non-examining sources.  (Tr. 61-67.)  First, the ALJ noted that despite Plaintiff's reported limitations, "he also testified he regularly engage[d] in a fair range of activities of daily living without significant issue or need for assistance," including "managing personal care, regularly taking prescribed treatment/medications, driving short distances/running errands, food shopping, and cleaning his room."  (*Id.*)  Next, the ALJ noted that the "record fail[ed] to convey objective medical evidence or positive clinical findings to suggest the claimant's impairments reach a level of severity to support a conclusion of 'disabled' under the Regulations."  (Tr. 62-63.)  According to the ALJ, "[t]reating and examining medical sources ha[d] similarly recorded some mild to moderate findings regarding claimant's impairments, with no significant deficits in overall physical or mental functioning" and "the claimant's impairments appear[ed]

manageable with ongoing follow-up care, appropriate conservative treatment and compliance." (Tr. 63.) The ALJ also found that progress notes from Plaintiff's medical providers at the VA demonstrated "generally conservative treatment, as well as largely normal general medical examinations." (*Id.*) The ALJ also stated that Plaintiff "receiv[ed] referrals as needed, and he [was] regularly continued on his treatment regimen." (*Id.*)

According to the ALJ, "VA and hospital records also infer[red] that when the claimant stop[ped] taking treatment/medications (as prescribed)[,] his COPD/asthma symptoms [were] exacerbated (Exhibits 29F and 32F)."[7] (*Id.*) To illustrate his inference, the ALJ pointed to Plaintiff's September 2017 hospitalization records, which he summarized as follows:

> [Plaintiff] presented at the hospital emergency room department (ED) with difficulty breathing; and an echo and carotid ultrasound were performed. Echo study showed normal ejection fraction; orthopedic static blood pressure negative; chest [X]-rays revealed no acute cardiopulmonary abnormality; and carotid ultrasound showed no evidence of hemodynamically significant stenosis bilaterally. The claimant also reported his symptoms started since he started Flomax; and he was advised to request an alternative treatment option with his urologist. For treatment plan, the claimant was started on antibiotics and Prednisone therapy; his symptoms improved; and upon discharge, he was advised to follow-up with his VA pulmonologist. Hospital records also reflect the claimant had "four COPD exacerbation[s] over the past 12 months" (Exhibits 29F, 31F[,] and 32F.)

---

[7] Of note, Exhibit 29F spans 147 pages (Tr. 2072-2218), and Exhibit 32F spans 31 pages (Tr. 2270-2300).

(*Id.*)  The ALJ then noted that Plaintiff followed up with his treating pulmonologist,

Giovanni Torri, M.D. at the VA clinic, who, according to the ALJ, noted that:

> [Plaintiff's] recent hospitalization the previous month (September 2017) [was] for COPD/asthma exacerbation; and the claimant stated, "he also ran out of inhalers."  It was also noted that chest [X]-rays obtained from the hospital showed "no evidence of acute cardiopulmonary abnormality [and] negative cardiac;" and the claimant improved ("feeling better") with conventional treatment involving Prednisone and antibiotics (Exhibit 32F/6-7).

(*Id.*)  The ALJ summarized what appeared to be normal findings, noting that "Dr.

Torri concluded [Plaintiff suffered from] asthma/COPD exacerbation, [and had]

probably not quite recovered from [the] recent exacerbation."  (*Id.*)

The ALJ also summarized January 2017 hospital records, noting that

Plaintiff "presented at the hospital in 'moderate' respiratory distress[,] and []

stated he was compliant with medication, 'but when asked exactly what his

regimen [was][,] he shrugged his shoulders.'"  (Tr. 64.)  According to the ALJ,

another emergency department attending doctor "also noted his 'concern that

[Plaintiff] [was] not maintaining his medication regimen at home' (Exhibit 29F/5-

7)."  (*Id.*)  The ALJ then noted that Plaintiff "also underwent spirometry testing in

January 2017, which showed only 'mild' OVD [obstructive ventilatory defect] with

no significant improvement post dilator; lung volume determinations showed no

significant abnormality, total lung capacity within normal limits; and diffusing

capacity [was] normal (Exhibits 28F/26)."  (*Id.*)  With respect to Plaintiff's other

hospitalizations due to COPD exacerbations, the ALJ summarized them as

follows:

> Notably the claimant was admitted multiple times through Baptist ED
> in 2016 (i.e., May 2016, September 2016[,] November 2016[,] and
> December 2016) with similar symptoms involving "moderate"
> respiratory distress, [shortness of breath], cough, and wheezing.
> Chest [X]-rays reveal[ed] "no acute process;" and the claimant's
> symptoms improved with Prednisone therapy and antibiotics. Upon
> discharge, the claimant was assessed in stable condition; he was
> advised to follow an "inhaler regimen" at home; and he was
> instructed to follow-up with his pulmonologist (Exhibits 27F, 29F, and
> 31F).

(*Id.*)

In making the RFC determination, the ALJ also evaluated, *inter alia*, the medical opinion evidence and accorded little weight to the medical opinions of Dr. Brown. (Tr. 65-66.) Based on "the totality of the objective medical evidence," the ALJ found "Dr. Brown's questionnaire responses too restrictive and unsupported by the treatment record" and that his medical opinions appeared to be largely based on Plaintiff's subjective complaints. (Tr. 66.) Therefore, the ALJ accorded Dr. Brown's medical opinions little weight. (*Id.*) The ALJ also accorded "substantial consideration" to the June 2015 consultative examination ("CE") report and statements by Timothy McCormick, D.O., a consultative medical examiner. (*Id.*) The ALJ also gave the opinions of Robert Chapa, M.D., who performed an Occupational Medicine Evaluation of Plaintiff in February 2016 in connection with a Worker's Compensation claim, "little, if any, weight." (Tr. 66-67.)

The ALJ also considered the "administrative findings" of Drs. H. Kushner and Loc Kim Le, non-examining State agency medical consultants, dated

September 2016 and September 2015, respectively, finding that Plaintiff could perform a range of "medium" work with limitations. (Tr. 67.) The ALJ found that "the medical assessments offered by Drs. Kushner and Le [were] an accurate summary of [the] medical evidence" and gave their opinions "significant weight, with greater weight accorded to Dr. Kushner's medical source statements" since his "assessment took into consideration more recent treatment records and objective findings." (*Id.*) Based upon these and other findings, the ALJ concluded that, although Plaintiff "may experience discomfort and physical limitations resulting from his impairments, he ha[d] not established that these symptoms [were] of such intensity and frequency that he [was] unable to work," and the limitations that existed were "accommodated within the" RFC. (*Id.*)

The ALJ then determined that, based on the testimony of the vocational expert ("VE"), Plaintiff was capable of performing his past relevant work as a deliverer, car detailer and lounge manager, and that this work did not require Plaintiff to perform work-related activities precluded by the RFC. (Tr. 67-68.) Thus, the ALJ found that Plaintiff was not disabled at any time from January 22, 2015, the alleged onset date, through February 6, 2018, the date of the opinion. (Tr. 68-69.)

### D. Analysis

The undersigned agrees with Plaintiff that the ALJ failed to properly weigh the medical opinion evidence, including the opinions of Dr. Brown, Plaintiff's treating physician. As noted by Plaintiff, while the ALJ cited his multiple

hospitalizations for COPD/asthma exacerbation, "he did not mention the length of each hospital stay, nor did he specify the level of treatment Plaintiff received, combining all of the 2016 hospital visits into one paragraph and glossing over the particulars, focusing instead on chest [X]-rays that revealed 'no acute process' and Plaintiff's condition at discharge." (Doc. 26 at 16.) Although these records support Dr. Brown's opinion and Plaintiff's testimony, the ALJ failed to address these medical records in any meaningful way which would allow the Court to determine whether the ALJ properly weighed and discounted this evidence. *See Meek v. Astrue*, No. 3:08-cv-317-J-HTS, 2008 WL 4328227, at *1 (M.D. Fla. Sept. 17, 2008) ("Although an ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision . . . . Rather, the judge must explain why significant probative evidence has been rejected.") (internal citations omitted); *Lord v. Apfel*, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) (stating that although the Commissioner is not required to refer to every piece of evidence in his decision, the Commissioner may not ignore relevant evidence, particularly when it supports the claimant's position).

Here, the record shows that during the relevant period, Plaintiff was hospitalized due to acute exacerbation of his COPD symptoms as follows: from May 29 to June 8, 2016 (Tr. 1594-1700); from September 6 to September 10, 2016 (Tr. 2183-2213); from November 3 to November 9, 2016 (Tr. 2144-82); from December 21 to December 24, 2016 (Tr. 2118-42); from January 19 to January 24, 2017 (Tr. 2073-2117); and from September 1 to September 7, 2017

(Tr. 2237-69). These records support Dr. Brown's medical opinion regarding Plaintiff's exertional limitations, including his opinion that Plaintiff would likely be off-task 25% of a normal workday and was expected to be absent from work four days per month due to his symptoms or treatment. The ALJ's conclusion that Plaintiff "may experience discomfort and physical limitations resulting from his impairments," but had "not established that these symptoms [were] of such intensity and frequency that he [was] unable to work," is not supported by the record as a whole, which shows that Plaintiff's symptoms required emergency and prolonged critical care during his hospitalizations.

The ALJ's inference that Plaintiff's hospitalizations for exacerbation of his COPD and asthma symptoms were the result of Plaintiff's non-compliance with medication and treatment is not supported by substantial evidence. Although the ALJ cites to portions of the record which allegedly support his conclusion, the ALJ fails to address the various records noting medication compliance and consistency with follow-up care. (*See, e.g.*, Tr. 2275 (October 11, 2017 notes by Dr. Torri indicating Plaintiff was compliant with medication); Tr. 1798-99 (March 1, 2017 notes by Dr. Torri indicating Plaintiff was compliant with his medication and "seem[ed] to be doing well following his last hospitalization with only occasional use of his albuterol/rescue medicine," and noting that his shortness of breath episodes were "usually triggered by significant exertion, hot/cold weather, exposure to dust, tobacco smoke, pollen and grass"); Tr. 1723 (February 17, 2017 notes by Dr. Torri indicating he "[s]trongly suspect[ed] asthma/reactive

airway in view of history with probably some underlying COPD," that there seemed to be some seasonal component to [Plaintiff's] symptoms as well," and that Plaintiff was using his steroid inhaler and was a good and reliable historian); *but see* Tr. 1769 (July 26, 2017 note by Dr. Brown indicating Plaintiff was inconsistent with taking medications and was still complaining of difficulty breathing).)

Also of note, the ALJ cited to the January 19, 2017 emergency department admission notes indicating that when asked about this medication regimen, Plaintiff shrugged his shoulders as evidence that Plaintiff was non-compliant; however, that same note indicated Plaintiff had to be taken to the hospital by ambulance and that Plaintiff was "in some moderate respiratory distress *making discussion difficult*." (Tr. 2076 (emphasis added).) Similarly, while the ALJ selectively cited to Dr. Fulton's January 19, 2017 notes, indicating that "[t]he attending [emergency department] physician also stated his 'concern that the patient [] [was] not maintaining his medication regimen at home,'" the ALJ failed to provide the full statement or the context for the statement, which reads, in part, as follows:

> Patient now presents with a recurrent COPD exacerbation without evidence of pneumonia or bronchitis. . . . *The patient has had a history of slow recovery from his COPD exacerbations. We will monitor him carefully. I am concerned that this patient is not maintaining his medication regimen at home <u>or</u> there is a secondary process in play here as he has had such frequent admissions in the last few months.* . . .

(Tr. 2078 (emphasis added).)  Thus, the undersigned finds that the ALJ's reasons for discounting Dr. Brown's medical opinions, including Plaintiff's physical limitations, time off-task, and likely absence from work four days per month due to his COPD/asthma symptoms, are not supported by the record as a whole.

Based on the foregoing, the ALJ's reasons for largely discounting the treating and examining opinions in the record appear to be unsupported by substantial evidence.  To the extent the ALJ relied on Dr. Le's June 2015 non-examining opinions, those opinions pre-dated a substantial part of the medical record, including the multiple hospitalization records.  Similarly, to the extent the ALJ accorded great weight to the September 2016 opinion of Dr. Kushner, that opinion fails to address Plaintiff's subsequent emergency hospitalizations for his COPD exacerbation.  Because the Court concludes that the ALJ erred in his evaluation of the medical opinions, the Court will not separately address Plaintiff's arguments regarding the ALJ's assessment of his subjective complaints.  Nevertheless, the Court notes that it was improper for the ALJ to conclude that Plaintiff's limited participation in certain daily activities, including household chores, was consistent with the ability to perform competitive work. The performance of limited daily activities is not necessarily inconsistent with allegations of disability.  *See, e.g.*, *Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (per curiam) (reversing and remanding the case to the Commissioner for lack of substantial evidence to support the finding that the claimant had no

severe impairment, even though the claimant testified that she performed housework for herself and her husband, accomplished other light duties in the home, and "was able to read, watch television, embroider, attend church, and drive an automobile short distances"); *White v. Barnhart*, 340 F. Supp. 2d 1283, 1286 (N.D. Ala. 2004) (holding that substantial evidence did not support the decision denying disability benefits, even though the claimant reported that she took care of her own personal hygiene, cooked, did housework with breaks, helped her daughter with homework, visited her mother, socialized with friends sometimes, and, on a good day, drove her husband to and from work, but needed help with grocery shopping, and could sit, stand, or walk for short periods of time).  Therefore, this case will be reversed and remanded for further proceedings.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or §

1383(d)(2) fee application shall be filed within the parameters set forth by the

Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42*

*U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov.

13, 2012).  This Order does not extend the time limits for filing a motion for

attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** in Jacksonville, Florida, on March 13, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE


Copies to:

Counsel of Record